# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Crim. No. 16-93-LPS |
| | : | |
| BRIAN WILSON, et al., | : | |
| | : | |
| Defendants. | : | |

---

## MEMORANDUM ORDER

At Wilmington this **13th** day of **March, 2018**, having considered Defendant Brian Wilson a/k/a "Fudayl Wakim" a/k/a "B-Wills"'s ("Wilson")[1] Motion to Suppress Intercepted Wire and Electronic Communications and All Evidence Adduced from Interception of Wire and Electronic Communications (D.I. 100) and Motion to Quash the Indictment (D.I. 101); Defendant Robert Shepherd a/k/a "Manny" a/k/a "Jig" a/k/a "Majid"'s ("Shepherd") Motion to Suppress (D.I. 98), Motion to Quash the Indictment (D.I. 98), and Motion to Transfer (D.I. 98); and Defendant Mark Bower a/k/a "Kenneth Flowers"'s ("Bower")[2] Motion to Suppress Evidence (D.I. 39),

**IT IS HEREBY ORDERED** that Wilson's suppression motion (D.I. 100) and motion to quash (D.I. 101) are **DENIED**; Shepherd's suppression motion (D.I. 98), motion to quash (D.I. 98), and transfer motion (D.I. 98) are **DENIED**; and Bower's suppression motion (D.I. 39) is

---

[1] Wilson changed his legal name to Fudayl Wakim during the pendency of proceedings. The Court uses Wilson to be consistent with the charging documents.

[2] Bower's given name is Kenneth Flowers; however, the charging documents use Mark Bower. The Court uses Bower to be consistent with the charging documents.

**DENIED**.

<u>Wilson's Suppression Motion</u>

1.     Wilson is charged with conspiracy to distribute and to possess with intent to distribute cocaine (Count 1) and conspiracy to distribute and to possess with intent to distribute heroin (Count 2). (*See* D.I. 64 at 1-3)  On October 13 and 14, 2016, Judge Robinson authorized the interception of three Target Telephones ("TT") belonging to Wilson ("TT1," "TT2," and "TT3"). (*See* D.I. 118 at 2; *see also, e.g.*, D.I. 118 Ex. 2 at 2-11 of 96 ("Initial Intercept Orders"))  The government's applications for TT1, TT2, and TT3 were each accompanied by the same 67-page affidavit by FBI Special Agent Shawn Haney ("SA Haney"). (*See* D.I. 118 at 2 n.3; *see also, e.g.*, D.I. 118 Ex. 2 at 25-91 of 96 ("Initial Affidavit"))  The Initial Affidavit explained that the FBI had been investigating an alleged drug-trafficking organization in Delaware known as the "BWILLS Crew" and had developed a number of suspects, the "Target Subjects." (*See* Initial Affidavit ¶¶ 24-33, 47)  Additionally, the Initial Affidavit listed nine "Target Objectives" for the wiretaps, including obtaining evidence of "[t]he nature, extent, and methods of operation" of the BWILLS Crew, "[t]he locations where the controlled substances are stored," "[t]he identities of co-conspirators" and "sources of supply," and "[t]he location and source of resources used to finance the illegal activities." (*Id.* ¶ 35)

2.     On October 31, 2016, Judge Robinson issued two additional intercept orders, one for Wilson's fourth telephone ("TT4") and one for the telephone of Wilson's co-defendant, Thomas Brooks ("Brooks") ("TT5"). (*See* D.I. 118 at 2; *see also, e.g.*, D.I. 118 Ex. 3 at 73-82 of 87 ("Second Intercept Orders"))  The government's applications for TT4 and TT5 included an updated affidavit from SA Haney. (*See* D.I. 118 at 2 n.3; *see also* D.I. 118 Ex. 3 at 2-72 of 87

("Second Affidavit")) Like the Initial Affidavit, the Second Affidavit included information about its Target Subjects and Target Objectives. (*See* Second Affidavit ¶¶ 23-28, 30) The wiretaps lasted approximately six weeks, concluding around November 24, 2016. (*See* D.I. 100 at 3)

3.      Wilson moves to suppress wiretap evidence collected from TT1–TT5[3] pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-22, on four grounds: (1) the wiretaps were not supported by probable cause; (2) the government failed to show necessity; (3) the wiretaps were required to cease no later than October 24, 2016; and (4) the government failed to reasonably minimize. (*See generally* D.I. 100) The Court heard argument on Wilson's motion on January 12, 2018. ("Tr.")

Probable Cause

4.      Wilson contends that the wiretap evidence must be suppressed because the government's applications relied on stale and uncorroborated confidential informant information, thereby failing to establish probable cause. (*See* D.I. 100 at 3-4; D.I. 125 at 1-3)

5.      Under Title III, a judge may authorize interception of wire and electronic communications if, based on the government's application, the judge determines there is probable cause (1) "that an individual is committing, has committed, or is about to commit" an enumerated offense; (2) "that particular communications concerning that offense will be obtained through such interception;" and (3) that the "facilities" or "place" where the intercepts are to occur – that is, the phone – are connected to the offense or associated with the individual. *See* 18

---

[3]While Wilson does not specify which Intercept Orders he is challenging, the Court assumes he is challenging them all. As to TT5, a phone Wilson did not own, Wilson has standing as an "aggrieved person" to challenge the admissibility of intercepted communications involving him. *See United States v. Armocida*, 515 F.2d 29, 35 n.1 (3d Cir. 1975).

U.S.C. § 2518(3)(a)-(b), (d); *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005). The probable cause requirements of Title III are governed by the same law as traditional Fourth Amendment searches. *See United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983). Whether probable cause exists is a "flexible" standard that requires "practical, common sense" decision-making by the issuing court. *See Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The issuing judge's probable cause determination is entitled to "great deference" and will be upheld so long as the judge had a "substantial basis" for concluding probable cause existed as to the Title III requirements. *See id.* at 236 (internal quotation marks omitted).

6.    Here, the issuing court had a substantial basis for concluding each wiretap application established probable cause for each Title III requirement. For TT1–TT3, the Initial Affidavit contains information from seven confidential sources ("CS-1–CS-7") and ten controlled purchases of heroin and/or cocaine. (*See* Initial Affidavit ¶¶ 50-78) The confidential sources provided information about Wilson's involvement in drug trafficking, including the types of drugs Wilson was selling (heroin and cocaine), the suspected locations of Wilson's suppliers (Philadelphia, PA) and customers (south of Wilmington), his preferred quantities of distribution, and common meet-ups for drug transactions. (*See, e.g., id.* ¶¶ 54-56) The Initial Affidavit also details the execution of the ten controlled purchases, all of which were coordinated using TT1–TT3. (*See id.* ¶¶ 60-78) First-hand observation by federal agents of FaceTime calls, toll record analysis, pen register information, and physical surveillance revealed Wilson using TT1 and TT3 to arrange the majority of the controlled purchases. (*See id.* ¶¶ 61-70, 75-77; *see also, e.g., id.* ¶¶ 68, 76 (explaining, in SA Haney's opinion, callers' use of coded language)) As to TT2, the Initial Affidavit explains that CS-5 informed federal agents that Wilson had acquired a

4

new phone, and a subsequent controlled purchase and an attempted controlled purchase were arranged by Wilson using TT2. (*See id.* ¶¶ 72, 75, 79) Based on this information, the issuing court had more than a substantial basis to conclude Wilson was engaged in drug trafficking activity and was using TT1–TT3 to do so.

7.     Wilson's probable cause challenge fares no better for TT4 and TT5. The Second Affidavit incorporates the Initial Affidavit by reference and includes new evidence of Wilson arranging, carrying out, and following up on drug sales by phone. (*See* Second Affidavit ¶¶ 46, 53-76) For TT4, the Second Affidavit details calls from Wilson (using TT3 and TT4) to others informing them that he has a new phone number, TT4, and to no longer use TT3. (*See id.* ¶¶ 89-90) (recounting Target Subject saying to Wilson, "I'm ready for our situation" and Wilson responding, "Alright. . . . I'm getting ready to call you from my new number [TT4].") As to TT5, toll record analysis, pen register information, and agent-monitored phone calls revealed Brooks using TT5 during both an attempted and a successful controlled purchase. (*See id.* ¶¶ 51-52) Additionally, the Second Affidavit describes multiple intercepted calls from Wilson (on TT3) to Brooks (on TT5) discussing heroin sales. (*See id.* ¶¶ 77-84) (explaining coded conversations) Given that information, the issuing court had a substantial basis to conclude Wilson and Brooks were engaged in drug-trafficking activity and were using TT4 and TT5 to that end.

8.     Wilson's staleness contentions do not defeat these conclusions. Where, like here, a wiretap application alleges continuous criminal activity, the concept of staleness is less easily applied and carries less force. *See Tehfe*, 722 F.2d at 119-20. Though Wilson is correct that the government's first confidential source dates back to October 2013 (*see* Initial Affidavit ¶ 40),

that fact simply indicates the long-running nature of Wilson's alleged drug-trafficking activity. Moreover, the October 2013 interview is *far* from the only information in the Affidavits that establishes probable cause. Indeed, the overwhelming majority of the information in the Initial Affidavit was developed between May and late September 2016, just weeks before the Initial Intercept Orders were authorized. (*See id.* ¶¶ 50-79) That information, particularly in the context of this long-running investigation, was not stale. *See Tehfe*, 722 F.2d at 1120 (requiring staleness to be construed liberally when alleged criminal operation is "one of several years standing"). Likewise, the Second Affidavit, which was updated with information collected during the two weeks between the Initial and Second Affidavits, was not outdated. (*See, e.g.*, Second Affidavit ¶¶ 77-89)

9.      Wilson's contention that the Affidavits relied on uncorroborated confidential source information is also unavailing. While an informant's reliability and knowledge are important considerations in determining probable cause, they must be considered under the totality of the circumstances. *See Gates*, 462 U.S. at 238 (overruling two-prong test of *Spinelli v. United States*, 393 U.S. 410 (1969)). Important to that analysis is the "corroboration of details of an informant's tip by independent police work." *Id.* at 241. Though Wilson contends the government "advanced its investigation" with information from CS-1–CS-4 "without any proof of corroboration," the Initial Affidavit, in fact, lists the efforts used to corroborate each informant's information, including "analysis of subpoenaed records; debriefings of other confidential informants; surveillance, and government records." (*See* Initial Affidavit ¶¶ 40-43) Moreover, the information provided by each confidential source aligned with that provided by

the others[4] and was also corroborated by ten controlled purchases. *See United States v. King*, 2006 Wl 1489064, at *90-91 (3d Cir. May 31, 2006) (finding confidential source information corroborated by controlled buy).

Necessity

10. Wilson also contends that the wiretaps were not necessary given the success of the government's previous investigative techniques. (*See* D.I. 100 at 5-7)

11. When applying for a wiretap, the government must make a showing of necessity. *See* 18 U.S.C. § 2518(3)(c). To do so, the affidavit must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c). The government's burden in this regard is "not great." *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975). It need only lay a "factual predicate" explaining why other investigative methods are inadequate. *Id.* While the Court reviews whether the application contains the requisite statement of necessity de novo, if the application contains such a statement, the issuing court's determination of necessity is reviewed only for abuse of discretion. *See United States v. Heilman*, 377 F. App'x 157, 175 (3d Cir. 2010). The Initial and Second Affidavits each contain statements of necessity. (*See* Initial Affidavit ¶¶ 87-122; Second Affidavit ¶¶ 100-40) Thus, the Court reviews the issuing court's necessity determination for abuse of discretion.

12. Both the Initial and Second Affidavit satisfy the necessity requirement. The Initial Affidavit contains a 17-page description of the limitations of the government's previous

---

[4]The bulk of the confidential source information was provided by CS-5–CS-7, none of which Wilson challenges as insufficiently corroborated. (*See* Initial Affidavit ¶¶ 54-59; Second Affidavit ¶¶ 34, 41-46)

investigative techniques and an explanation of why others were likely to fail. (*See* Initial Affidavit ¶¶ 87-122) For example, the Initial Affidavit explained that physical surveillance did not allow officers to "confirm the purpose or substance" of the Target Subjects' meetings, increased the risk of the investigation being compromised, could jeopardize informants' safety, and was often thwarted by counter-surveillance techniques employed by the Target Subjects. (*See* Initial Affidavit ¶¶ 90-93, 102) The Initial Affidavit provides similar explanations with respect to eight other investigative techniques. (*See* Initial Affidavit ¶¶ 103-21) The Second Affidavit is substantially similar to the Initial Affidavit in relation to necessity, detailing the limitations of pole cameras, GPS tracking, cell phone location data, use of the grand jury, and many other techniques. (*See* Second Affidavit ¶¶ 104-39; *see also, e.g., id.* ¶ 112) (explaining GPS tracking had failed because Wilson's car was "driven into the Christiana River with the GPS still attached" before government could retrieve tracker) This was sufficient to show necessity. *See United States v. Cannon*, 685 F. App'x 114, 116 (3d Cir. 2017) (finding necessity requirement satisfied where affidavit discussed target subjects' ability to "spot surveillance and flee," confidential informants' "fear of reprisal," and difficulty infiltrating drug-trafficking organization hierarchy); *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976) ("It is sufficient that the government show that other techniques are ***impractical*** under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." (emphasis added)).

13. Wilson's contention that the government's previous investigative success rendered the wiretaps unnecessary misses the mark. "The Third Circuit has repeatedly held that, even where traditional investigative techniques have been successful in implicating one or more

members of a large-scale conspiracy, wiretaps are permissible where traditional investigative measures will not meet the government's objectives of ascertaining the scope of an alleged conspiracy and identifying all of its participants." *United States v. Cannon*, 2015 WL 6391096, at *2 (D. Del. Oct. 22, 2015) (collecting cases), *aff'd*, 685 F. App'x 114 (3d Cir. 2017). When the Initial Intercept Orders were authorized, the government did not know the identity of all the BWILLS Crew members or its suppliers, where the drugs were stored, how the drugs were transported and distributed, or how the drug proceeds were laundered. (*See* Initial Affidavit ¶ 88; *see also* Tr. at 82–83) These Target Objectives remained unmet as of the date of the Second Affidavit. (*See* Second Affidavit ¶ 101) These were crucial objectives of the investigation, and the Initial and Second Affidavits adequately explained the limitations of other investigative methods to achieving them. Thus, the issuing court did not abuse its discretion in determining that wiretaps were necessary to uncover the full extent of the alleged conspiracy.

### Termination of the Wiretaps

14.    Wilson contends the government was required to stop intercepting his communications after October 24, 2016, when communications implicating Wilson in the arrangement and execution of a drug deal were intercepted. (*See* D.I. 100 at 7)

15.    Under Title III, the issuing court must include "a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained." § 2518(4)(e). Wiretaps need not terminate once the government has collected "minimal evidence of guilt of the party subject to the interception." *Vento*, 533 F.2d at 852-53.

16.    The Intercept Orders state that "such interception(s) shall ***not*** terminate automatically after the first interception that reveals the manner in which the alleged co-

9

conspirators . . . conduct their illegal activities." (Initial Intercept Orders at 3; Second Intercept Orders at 3) (emphasis added) Rather, the intercepts were to "continue until all communications are intercepted which reveal fully the manner in which the [Target Subjects] . . . are committing the TARGET OFFENSES . . . , and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy." (*Id.*) Interception was to terminate only "upon the attainment of the authorized TARGET OBJECTIVES," subject to a 30-day limit. (Initial Intercept Orders at 8; Second Intercept Orders at 8)

17.     As of October 24, 2016, the date Wilson contends the intercepts were required to stop, law enforcement still did not know the identity of Wilson's supplier, the identity of all co-conspirators, how the drugs were being distributed, or where the drugs were being stored. (*See* Second Affidavit ¶ 101) Thus, many of the Target Objectives – which were aimed at the drug trafficking organization as a whole, and not simply Wilson – remained unmet. As such, the government was not required to terminate the wiretaps on the date Wilson's contends.

Minimization

18.     Finally, Wilson contends that the wiretap evidence must be suppressed because the government failed to appropriately minimize. (*See* D.I. 100 at 8-9)

19.     When conducting wiretaps, the government must minimize interception of non-pertinent communications. *See* § 2518(5); *Armocida*, 515 F.2d at 42. Whether the government appropriately minimized depends "on the 'reasonableness' of [the government's] minimization efforts, under the totality of the circumstances." *United States v. Hull*, 456 F.3d 133, 142 (3d Cir. 2006) (quoting *Scott v. United States*, 436 U.S. 128, 139 (1978)). Where "complete disregard" of the minimization requirement is not alleged, compliance with § 2518(5) is judged

by the good faith efforts of law enforcement. *See Armocida*, 515 F.2d at 44. Compliance with minimization requirements is determined on a case-by-case basis, and in making that determination, courts must consider (1) "the nature and scope of the criminal enterprise under investigation;" (2) "the government's reasonable expectation as to the character of, and the parties to, the conversations;" and (3) "the degree of judicial supervision by the authorizing judge." *Id.* The government must make an initial showing that its minimization efforts were reasonable. *See id.* at 45. If the government does so, the defendant must then "show more effective alternative procedures for minimization which nevertheless would permit the government to achieve its objectives." *Id.*

20.    Wilson, an avid shoe collector, contends "[i]t is entirely possible that" a November 3, 2016 call between Wilson and his co-defendant Shepherd, in which the two discuss dropping off sneakers and ordering food, was just that – a call about sneakers and food. (*See* D.I. 100 at 8-9) The government, however, urges the Court to examine the call in the context of the other calls that surround it; namely, calls in which Wilson and Shepherd "try and meet at a gas station or other places where 'milk' is found" and express concern "about 'state security or them people.'" (*See* D.I. 118 at 17-18) (quoting D.I. 2 ¶¶ 16-17) These calls, in the government's view, demonstrate that the challenged call was not innocent, but instead pertained to a drug deal. (*See id.*)

21.    While the challenged call appears more criminal than benign, the Court need not definitively decide that question here. Generally, very brief calls – those clocking in at under two minutes in length – are too brief to allow the government to determine their "eventual direction and relevancy to the investigation" and thus do not serve as a basis to suppress wiretap evidence.

11

*Armocida*, 515 F.2d at 45; *see also id.* (eliminating from consideration all "interception[s] of a one-and-one half minute to two minute conversation"). The challenged call was less than two minutes long (*see* D.I. 118 at 18) and is not, alone, a basis to suppress the wiretap. Moreover, even if the call exceeded two minutes, a single phone call is not enough, in the context of this particular investigation, to warrant suppression. The investigation in this case is very similar to the one at issue in *Armocida*, where the government was investigating a large-scale drug-trafficking organization and where the purpose of the wiretaps was, in part, "to identify other participants in the conspiracy and to determine the scope of the conspiracy." *Id.* at 44. Additionally, as in *Armocida*, the government did not know all of the members of the BWILLS Crew, and thus could not tailor its minimization efforts based on something it did not know. *See id.* at 45. Accordingly, one call here is not enough to warrant suppression of all the wiretap evidence. *See id.* at 44 (recognizing need for "greater latitude" in cases where coded language used). Finally, the Intercept Orders required the government to report to the issuing court, which the Court can also consider as a factor supporting the reasonableness of the minimization efforts. (*See* Initial Intercept Orders at 9; Second Intercept Orders at 9; *see also Armocida*, 515 F.2d at 44-45) Thus, the government has made a *prima facie* showing of reasonableness, shifting the burden to Wilson "to show more effective alternative procedures for minimization which nevertheless would permit the government to achieve its objectives." *Armocida*, 515 F.2d at 45. Wilson has offered no alternatives, and thus his challenge fails.

Shepherd's Suppression Motion

22.     Shepherd is charged with conspiracy to distribute and to possess with intent to distribute cocaine (Count 1). (*See* D.I. 64 at 1-2) Following his arrest, Shepherd was brought to

an FBI office in the Eastern District of Pennsylvania, where SA Haney and others interviewed him. (*See* D.I. 118 at 4) Shepherd moves to suppress statements he made during the interview, contending they were coerced and obtained in violation of his right to counsel. (*See* D.I. 98 at 8-9) The Court held an evidentiary hearing on Shepherd's motion on January 12, 2018.[5]

<u>Voluntariness</u>

23.     The Fifth Amendment provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Accordingly, "it is clear that 'only voluntary confessions may be admitted at the trial of guilt or innocence.'" *United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (quoting *Lego v. Twomey*, 404 U.S. 477, 478 (1972)). If a person's will is overborne or his capacity for self-determination critically impaired, the person's statements are involuntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). Whether a defendant's confession was voluntary is based on the totality of the circumstances of the interrogation, including any "police coercion, the length of the interrogation, its location, its continuity, [and] the defendant's maturity, education, physical condition, and mental health." *Swint*, 15 F.3d at 289 (internal citations omitted); *see also United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (including as factors suspect's background, experience, and prior dealings with criminal justice system). However, the crucial factor – and the necessary predicate for a finding of involuntariness – is coercive police activity. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Although there is no precise definition of 'coercive police activity,' the Supreme Court has identified the following examples as constituting such: interrogating the

_____

[5]Citations to standalone exhibits refer to exhibits introduced at that hearing. (*See* D.I. 151)

defendant for four hours while incapacitated and sedated in intensive care unit; interrogating a medicated defendant for over eighteen hours without food or sleep; holding a gun to the head of a wounded defendant to extract a confession; interrogating a defendant for sixteen days in a closed cell without windows, limited food, and coercive tactics; and holding a defendant for four days with inadequate food and medical attention." *Evans v. Phelps*, 2012 WL 1134482, at *9 (D. Del. Apr. 2, 2012). The burden is on the government to prove voluntariness by a preponderance of the evidence. *Lego*, 404 U.S. at 489.

24.     Shepherd, a former informant, contends that officers attempted to "exploit [his] fear" of being housed in Delaware with "questions . . . designed to break [his] will." (D.I. 98 at 8) This contention is not supported by the record. Shepherd, after having been advised of his *Miranda* rights, waived them both verbally and in writing. (*See* D.I. 118 Ex. 5 at 8-10, Ex. 7; Gov't Ex. 1A) This alone is "strong proof" that Shepherd's statements were voluntary. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (stating "express written or oral statement of waiver . . . is usually strong proof" of waiver's validity). The fact that SA Haney informed Shepherd of all his rights at once, rather than individually, is inconsequential. *See Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (rejecting notion that *Miranda* warnings must be given in particular form to be valid). When Shepherd told the agents that he was afraid of being housed in a Delaware facility, the agents – rather than exploiting his fear – repeatedly attempted to allay his concerns. (*See, e.g.*, D.I. 118 Ex. 5 at 74–75 (recording Shepherd stating, "I'm not trying to go over there [to Delaware]" and agent responding, "No, no, no. I know you have people there"); *id.* at 2 ("*[W]e'll make sure you're somewhere where you're going to be safe*. . . . You're probably going to go to a *court* in Delaware. I'm not saying you're going to be in the *facility* in

Delaware.") (emphasis added)) When agents did try to get Shepherd to talk, they focused not on the danger he might face in Delaware, but on the amount of evidence they had against him. (*See, e.g., id.* at 32) ("This is your opportunity to come clean. . . . With all this evidence that we have – and I'm only scratching the surface.") This is a proper interrogation technique. *See Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986) (playing on suspect's sympathies or emphasizing that honesty is best policy does not render statement involuntary, "so long as [the decision to talk] is a product of the suspect's own balancing of competing considerations"). In short, "there is simply no evidence in the record to indicate any degree of coercion beyond the most basic police interrogation techniques." *Sweet v. Tennis*, 386 F. App'x 342, 348 (3d Cir. 2010).

25.     Additionally, there is nothing in the record that indicates Shepherd's age, maturity, education, or physical and mental condition impaired his ability to understand his *Miranda* rights or the implications of waiving them. (*See* Tr. at 30) Moreover, Shepherd has prior experience with the criminal justice system, including acting as a cooperator in a federal drug trafficking case, indicating less susceptibility to pressure. (*See* Gov't Ex. 5 (reflecting Shepherd's criminal history, including prior drug arrests and prior federal drug trafficking charge); *see also United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) ("A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry.")) Shepherd's behavior during the interrogation reflected a familiarity with the interrogation process, including the ways Shepherd could leverage his knowledge of illegal activities to his advantage. (*See, e.g.*, D.I. 118 Ex. 5 at 8 (stating, in response to topic of *Miranda* rights, "I know how it works"); *id.* at 76 ("No, that's what I told him I would be, like – like, like an informant.")) Quite simply, nothing in the record suggests

Shepherd's will was overcome or his capacity for self-determination impaired.

Invocation of Right to Counsel

26.     A suspect wishing to invoke his right to counsel must do so unambiguously. *See Davis v. United States,* 512 U.S. 452, 459 (1994). Once invoked, all questioning must stop and cannot begin again "until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458. However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," cessation is not required. *Id.* at 459.

27.     Shepherd contends he unambiguously invoked his right to counsel twice during the interrogation. The first alleged invocation is as follows:

| | |
|---|---|
| Shepherd: | He's not gonna be able to help me with that. |
| | ***Like, I would have to wait till, like, a lawyer, and then they could explain because I know I'm not going to get out today to work or none of that, so – you know what I''m saying?*** |
| Agent: | What is it? |
| Shepherd: | No, that's what I told him I would be, like – like, like an informant. . . . it has nothing to do with [Wilson], but I have, I have something huge. |

(D.I. 118 Ex. 5 at 76) (emphasis added)

28.     This is not an unambiguous request for counsel. Though Shepherd mentions getting a lawyer, it is not clear whether Shepherd is talking about having a lawyer for his initial appearance to help him be released and become an informant or is simply explaining to the agents why he cannot provide them with information (as he wants to have an attorney present before he talks). (*See* Tr. at 32) In any event, it is not clear enough to be an unambiguous

invocation of his right to counsel. *See United States v. Briggs*, 347 F. App'x 750, 753-54 (3d Cir. 2009) (deeming defendant's statement that "he did not want to answer any questions until he found out if his mother obtained counsel for him" ambiguous).

29.     The second alleged invocation follows:

| Shepherd: | ***When do I get to call – like, could I call somebody and they send me a lawyer or something?*** |
|---|---|
| SA Haney: | I mean, just for the initial appearance, you know, unless you – I mean, if you want – ***what do you want them to be here while you, you talk to us***, or are you looking just for the initial appearance, or basically – |
| Shepherd: | Unless y'all gonna get something – y'all gonna get me – unless y'all would get me . . . out of here.  Y'all gonna get me bail? |
| SA Haney: | Here's the only problem with that is unless we have more details – I mean, I can tell you right now, just by saying – |
| Shepherd: | Well, y'all gonna get me no bail, man.  Y'all give me a bail . . . I  got – we can work something. |
| Harron: | Well, the only problem is, right now, as it is, you're not giving us anything to get you any real reason to – |
| Shepherd: | [motioning to video camera] Because I'm not gonna say that on here. |
| Harron: | I understand that. Unfortunately we're kind of stuck with that right now. |

(D.I. 118 Ex. 5 at 139–40) (emphasis added)

30.     While a closer call, Shepherd's second statement falls short of the clarity demanded by *Davis* to require cessation of questioning.  Though Shepherd's question could be understood as a request for counsel, a reasonable officer could also interpret his question as simply asking when he will get his call or whether he would have an attorney for an initial appearance. (*See* Tr. at 35)  Thus, at most, Shepherd's question "***might be*** invoking the right to counsel," which is insufficient to trigger cessation. *Davis*, 512 U.S. at 453 (emphasis added); *see*

*also Flamer v. Delaware*, 68 F.3d 710, 725 (3d Cir. 1995) (holding defendant's "request to call his mother 'to inquire about . . . possible representation'" insufficient to trigger cessation requirement) (internal citations omitted); *United States v. Sharp*, 2002 WL 31855064, at *4 (D. Del. Dec. 20, 2002) ("[C]ourts of appeal have . . . upheld continued interrogation in response to questions about the possibility of getting a lawyer."). Indeed, SA Haney's reaction – asking for clarification – confirms the ambiguity of Shepherd's question. *See generally Davis*, 512 U.S. at 461 (declining "to adopt a rule requiring officers to ask clarifying questions"). Rather than seizing upon SA Haney's question as an opportunity to clearly state he wanted an attorney present, Shepherd steered the conversation away from representation and toward whether the government could get him bail and the possibility of becoming an informant. (*See* D.I. 118 Ex. 5 at 139–40) Thus, the interviewing agents were not required to cease questioning.

<u>Shepherd's Motion to Transfer</u>

31.     Shepherd seeks a transfer from Howard R. Young Correctional Institution ("Gander Hill") based on the conditions at the prison, its lack of sufficient federal legal resources, and for the convenience of counsel. (*See* D.I. 98 at 3, 15; Tr. at 56-57) Shepherd does not challenge the constitutionality of his confinement, but rather seeks a transfer "in the interests of justice." (D.I. 98 at 16) The government defers to the U.S. Marshals Service, but notes Shepherd's current placement was necessitated by a separation order. (*See* D.I. 118 at 33-34) The Court heard argument on Shepherd's motion on January 12, 2018.

32.     Shepherd has failed to articulate any basis for the Court to order his transfer. While inmates must have "adequate, effective, and meaningful" access to the courts, Shepherd has direct access to his attorney, who can provide Shepherd with pertinent legal materials and

18

whose presence means Shepherd is not preparing for trial alone, but rather is doing so with the assistance of counsel. *Bounds v. Smith*, 430 U.S. 817, 822 (1977); *see also id.* at 830-32 (holding prisons must give inmates access to law libraries or acceptable alternative, like direct legal assistance). Moreover, the United States Supreme Court has held that an inmate has no constitutional right to be incarcerated in a particular institution, whether it be inside or outside the state of conviction. *See Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983); *see also Walls v. Taylor*, 2004 WL 906550, at *1 (Del. 2004) (table) (recognizing "prison officials have discretion to house inmates at the facilities they choose"). Thus, the Court lacks authority to dictate where Shepherd is housed. *See Meachum v. Fano*, 427 U.S. 215, 228-29 (1976) (declining to "involve the judiciary in issues and discretionary decisions that are not the business of federal judges"); *see also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (emphasizing that corrections officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

<u>Defendants' Motions to Quash the Superseding Indictment</u>

33.    Wilson and Shepherd both move to quash the Superseding Indictment, contending it lacks sufficient detail to allow them to prepare a defense or protect against double jeopardy. (*See* D.I. 101 at 5-6; D.I. 98 at 10; *see also* Tr. at 5-9)

34.    An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). To be sufficient, an indictment must "(1) contain[] the elements of the offense intended to be charged, (2) sufficiently apprise[] the defendant of what he must be prepared to meet, and (3) allow the defendant to show

with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (internal quotation marks omitted). Nothing more "than the statutory language is required so long as there is sufficient factual orientation to permit a defendant to prepare [a] defense and invoke double jeopardy." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (internal quotation marks omitted). Sufficient factual orientation exists where the indictment "informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *Id.*

35.    The Superseding Indictment satisfies this standard. Wilson and Stepherd are charged in Count One with violating 21 U.S.C. § 846, which subjects "[a]ny person who attempts or conspires to commit any offense defined in this subchapter" to punishment. (*See* D.I. 64 at 1-2) Count One alleges that Wilson and Shepherd knowingly conspired to possess with the intent to distribute a controlled substance, specifically cocaine. (*See id.*) Thus, Count One lists all of the required elements of the charged offense. *See Unites States v. Johnstone*, 856 F.2d 539, 541 (3d Cir. 1988). Count One also specifies the time frame (from "March 21, 2016, through on or about May 23, 2017") and geographical area where the alleged conspiracy took place ("the District of Delaware and elsewhere") and names Wilson and Shepherd's alleged co-conspirators (the five named co-defendants and "other persons known and unknown to the Grand Jury"). (*See* D.I. 64 at 1) The Court is persuaded that this information is sufficient factual orientation for Defendants to prepare to defend themselves and protect against double jeopardy with respect to Count I. *See Johnstone*, 856 F.2d at 542-43 (holding indictment alleging violation of § 846 that included information about time frame, geographical scope, and plan of conspiracy – but lacked

any detail about defendant's role in conspiracy – sufficient).

36.      Defendants' contention that because the Superseding Indictment contains "no

factual allegations," therefore its unbounded reference to "in the District of Delaware and

elsewhere" is "fatal" (Tr. at 5, 7) is unavailing.  As already noted, the indictment need not allege

the specific role played by each defendant.  *See Johnstone*, 856 F.2d at 542 ("The fact that the

indictment does not specifically allege the role played by Johnstone in carrying out the

conspiracy is not significant in this case.  It is neither an element of 21 U.S.C. § 846 nor a

constitutional requirement that a defendant have committed an overt act in furtherance of the

conspiracy."); *see also United States v. Smith*, 692 F.2d 693, 696 (10th Cir. 1982) ("We begin by

noting that an indictment under section 846 need not allege overt acts and is basically sufficient

if set out substantially in the words of the statute." (internal quotation marks omitted)).

Moreover, the Court is persuaded that the Superseding Indictment – by specifying a finite time

period, particular controlled substances, five co-conspirators, and at least one definitive location

where the alleged conspiracy took place – would allow Defendants to invoke double jeopardy in

a subsequent prosecution.  *See Wilkerson v. Superintendent Fayette SCI*, 871 F.3d 221, 232 (3d

Cir. 2017) (discussing evaluation of double jeopardy claim); *Johnstone*, 856 F.2d at 542-43;

*Huet*, 665 F.3d at 596 (reversing dismissal of indictment where indictment listed elements of

charged offense and "specifie[d] the time period during which the violation occurred"); *see also*

*Smith*, 692 F.2d at 696 (finding indictment alleging conspiracy "in the District of Wyoming and

elsewhere" sufficient because it alleged specific beginning and end dates, the types of drug

involved, and "Wyoming, as one site for its resale").

37.      Likewise, Count Two charges Wilson with violating § 846 by knowingly

conspiring to possess with the intent to distribute heroin, thus listing all the elements of the charged offense. *See Johnstone*, 856 F.2d at 541. Count Two further alleges Wilson did so from "May 1, 2016, through on or about November 5, 2016, in the District of Delaware and elsewhere" with two of his codefendants, as well as "other persons known and unknown to the Grand Jury." (*See* D.I. 64 at 2) For the reasons discussed above, this is sufficient. *See Johnstone*, 856 F.2d at 542-43; *Huet*, 665 F.3d at 596; *Smith*, 692 F.2d at 696. Accordingly, the Superseding Indictment – in both Counts One and Two – contains sufficient factual orientation to allow Wilson and Shepherd to prepare a defense and invoke double jeopardy, if necessary.

Bower's Suppression Motion

38.     Bower is charged with conspiracy to distribute and to possess with intent to distribute cocaine (Count 1), conspiracy to distribute and to possess with intent to distribute heroin (Count 2), and maintaining a dwelling for drug distribution (Count 3). (*See* D.I. 64 at 1-3) On November 4, 2016, SA Haney sought and obtained a search warrant for Bower's residence, 19 W. 30th Street, Wilmington, Delaware ("Residence"). (*See* D.I. 39 ¶ 2) As part of the warrant application, SA Haney submitted a 20-page affidavit detailing his own background, the history of the investigation into the BWILLS Crew, surveillance evidence related to the Residence – which was thought to be one of Wilson's drug stash locations – and the items likely to be found there. (*See* D.I. 161 at 2-21 of 25 ("Residence Affidavit"); *id.* Attach. B)

39.     Bower moves to suppress the evidence collected at the Residence, contending the "sloppiness" and "self-contradictory conclusions" of the Residence Affidavit show (1) the search warrant was not supported by probable cause and (2) no reasonable officer could have believed it was supported by probable cause. (*See* D.I. 52 at 3-4)

Probable Cause

40.    Law enforcement may obtain a search warrant upon a showing of probable cause.
Fed. R. Crim. P. 41. "Probable cause is a 'fluid concept' that 'turn[s] on the assessment of
probabilities in particular factual contexts.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir.
2010) (alteration in original) (quoting *Gates*, 462 U.S. at 232).  It is a "flexible" standard that
requires "practical, common sense" decision-making by the issuing court. *Gates*, 462 U.S. at
238-39. The issuing judge's probable cause determination is entitled to "great deference" and
will be upheld so long as the judge had a "substantial basis" for concluding probable cause
existed. *See id.* at 236 (internal quotation marks omitted).  In general, "doubtful or marginal
cases" should be decided based on "the preference to be accorded to warrants." *Id.* at 237 n.10
(internal quotation marks omitted).

41.    Bower contends that once the evidence in the Residence Affidavit is placed in
chronological order, "it is plain that the agents did not have probable cause to search" Bower's
Residence. (D.I. 52 at 1)  The Court disagrees.  When arranged in chronological order, the
Residence Affidavit alleges a pattern of Wilson (a participant in ten controlled purchases)
arranging drug sales, calling Bower to gain access to the Residence, going to the Residence,
staying for a very short period (*e.g.*, seven minutes), and then leaving to execute what were, in
SA Haney's opinion, drug sales – all in quick succession. (*See* Residence Affidavit ¶¶ 20, 33-42)
(detailing events of October 16, 23-24, and 27)  Moreover, the Residence Affidavit includes
wiretap and surveillance evidence showing that the *first* place Wilson went upon returning from
Philadelphia on November 3, 2016 – where, in SA Haney's opinion, Wilson was meeting with
his supplier – was Bower's Residence. (*See id.* ¶¶ 21-26)  Upon arriving at the Residence,

Wilson entered carrying a large bag, stayed for *three* minutes, and then left empty-handed. (*See id.* ¶ 27) This all occurred mere hours before the search warrant was authorized and, taken with the other information in the Residence Affidavit, gave the issuing court a substantial basis to conclude probable cause existed to authorize a search of Bower's Residence.

42.     Indeed, it is the timing and circumstances surrounding Wilson's visits to Bower's Residence that defeat Bower's contention that the warrant was based merely on "Bower's association with Wilson, a drug dealer." (D.I. 164 at 2) For example, on October 23, 2016 at 6:51 pm, Wilson received a call requesting "two OZ's tomorrow," an apparent request for drugs. (*See* Residence Affidavit ¶ 35) At 7:16 pm, Wilson called Bower to see if he was home and then immediately left to go to the Residence. (*See id.* ¶¶ 37-38) Wilson arrived by 7:27 pm and left approximately fifteen minutes later. (*See id.* ¶ 38) The next day, the caller went to Wilson's house, where SA Haney believes they executed the "two OZ" drug deal. (*See id.*) Thus, it is the character and timing of Wilson's visits to Bower's residence – that is, the short duration of his visits and their temporal proximity to alleged drug transactions – that provided the "interrelated factors" justifying the search warrant. *See United States v. Harris*, 482 F.2d 1115, 1118 (3d Cir. 1973).

43.     Nonetheless, Bower argues that the Court must overlook this evidence and conclude, based on two alleged mistakes in the Residence Affidavit, that the search warrant was not supported by probable cause. (*See* D.I. 52 at 3-4) The Court disagrees. "[E]ven assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (internal quotation marks omitted); *see also United States v.*

24

*Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006) (warning against "examining each of the allegations in the affidavit *seriatim*[,] rather than collectively"). Bower points to two calls, one on October 16 and one on October 27, which appear out of sync with the timelines for those days.[6] (*See* D.I. 52 at 3) While Bower is correct that the calls' time stamps seem to be incorrect, his argument is unavailing. Even assuming that the Residence Affidavit's description of the calls' timing was inaccurate, the sequence of events based on the unchallenged evidence remains the same: Wilson would call Bower to gain access to the Residence after receiving a request for drugs (which Wilson would then complete shortly after leaving the Residence), and Wilson went to the Residence immediately following an alleged transaction with his suspected supplier. (*See* Residence Affidavit ¶¶ 39-42) Thus, even just the unchallenged wiretap and physical surveillance contained in the Residence Affidavit provided the issuing court with a substantial basis to conclude probable cause existed. *See Burton*, 288 F.3d at 103.

Good Faith Exception to the Exclusionary Rule

44.     Even if the issuing court lacked a substantial basis to conclude probable cause existed, the "extreme sanction of exclusion" is not warranted. *United States v. Leon*, 468 U.S. 897, 926 (1984). "The good faith exception instructs that suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority, even though no probable cause to search exists." *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002) (internal quotation marks omitted). "[A] warrant issued by a

---

[6]Bower does not challenge the existence of these two calls, the accuracy of the other time stamps in the Residence Affidavit (which Bower himself relies on), or the physical surveillance evidence. Rather, he challenges the existence of probable cause based on two time stamp errors, one of which may be as simple as an incorrect "p.m." instead of "a.m." designation. (*See* Residence Affidavit ¶ 31)

magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal quotation marks omitted). An officer's reliance is unreasonable, however, "[w]here the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Zimmerman*, 277 F.3d at 437.

45. Here, the Residence Affidavit contained information about Wilson's involvement in ten controlled buys, linked the timing of Wilson's visits to the Residence to alleged drug transactions, and explained that Wilson had dropped off a large bag at the Residence (after a meeting with his alleged supplier) just a few hours before the search warrant was obtained. (*See* Residence Affidavit ¶¶ 20-43) Moreover, the warrant was issued by a magistrate judge, which, together with the evidence contained in the Residence Affidavit, made the officers' reliance on the warrant reasonable. Thus, even if probable cause did not exist, the good faith exclusion would apply.

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE